IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Kurt Phillip Hoerath,  :
                Appellant  :
                 :
       v.  :  No. 946 C.D. 2022
                 :
Commonwealth of Pennsylvania,  :
Department of Transportation,  :
Bureau of Driver Licensing  :  Submitted:  May 26, 2023

BEFORE:    HONORABLE PATRICIA A. McCULLOUGH, Judge
                 HONORABLE ELLEN CEISLER, Judge
                 HONORABLE MARY HANNAH LEAVITT, Senior Judge

<u>OPINION NOT REPORTED</u>

MEMORANDUM OPINION BY
JUDGE CEISLER                               FILED:  September 8, 2023

Kurt Phillip Hoerath (Licensee) appeals from the August 8, 2022 Order of the Court of Common Pleas of Cambria County (Trial Court) dismissing his statutory appeal from the one-year suspension of his operating privilege imposed by the Department of Transportation, Bureau of Driver Licensing (DOT), pursuant to Section 1547(b)(1)(i) of the Vehicle Code, 75 Pa. C.S. § 1547(b)(1)(i), commonly known as the Implied Consent Law.[1]  DOT imposed the suspension due to Licensee's refusal to submit to chemical testing following his arrest for violating

---

[1] Section 1547(b)(1)(i) of the Implied Consent Law states:

> If any person placed under arrest for a violation of [S]ection 3802 [of the Vehicle Code, 75 Pa. C.S. § 3802 (relating to driving under the influence of alcohol or a controlled substance (DUI)),] is requested to submit to chemical testing and refuses to do so, the testing shall not be conducted but upon notice by the police officer, [DOT] shall suspend the operating privilege of the person . . . for a period of 12 months.

75 Pa. C.S. § 1547(b)(1)(i).

Section 3802 of the Vehicle Code, 75 Pa. C.S. § 3802 (relating to DUI). We affirm the Trial Court's Order.

## Background

On March 14, 2022, DOT notified Licensee that it was suspending his operating privilege for a period of one year, effective April 18, 2022, due to his refusal to submit to chemical testing on February 14, 2022, in violation of Section 1547(b)(1)(i) of the Implied Consent Law. Reproduced Record (R.R.) at 49a.

Licensee appealed to the Trial Court, which held an evidentiary hearing on July 22, 2022. At the hearing, DOT presented the testimony of Pennsylvania State Trooper Aaron Peterson. Licensee was present at the hearing but did not testify. Both parties were represented by counsel.

Trooper Peterson testified that he had seven and one-half years' experience as a State Trooper and had received training in both DUIs and field sobriety testing. Notes of Testimony (N.T.), 7/22/22, at 4, 10. Trooper Peterson estimated that he had made "dozens" of DUI arrests "throughout the years." *Id.* at 10.

Trooper Peterson testified that on February 14, 2022, he was dispatched to respond to a 911 report of a hit-and-run accident. *Id.* at 5. At the scene, Trooper Peterson met the 911 caller, Barbara Kick, who had advised dispatch that her vehicle "was rear-ended in front of Sheetz on Portage Street," that she followed the vehicle to a house on Prospect Street in the Borough of Portage "while she was on the phone with dispatch," and that she observed the male driver going "into a house on that street." *Id.* Ms. Kick's 911 call was received at 4:53 p.m., Trooper Peterson was dispatched at 5:02 p.m., and Trooper Peterson arrived at the home on Prospect Street at 5:17 p.m., "[t]wenty-four minutes from time of dispatch." *Id.* at 5-6.

2

When Trooper Peterson arrived at the scene on Prospect Street, Ms. Kick was standing outside of her vehicle, which was parked in front of the vehicle that had rear-ended her. *Id.* at 6, 25. Trooper Peterson was able to identify Licensee's vehicle because Ms. Kick had "provided [dispatch] with a description of the vehicle and a [license] plate number." *Id.* at 6. Trooper Peterson testified that Licensee exited his home "[s]hortly after" he arrived and "walked down to the street where [Trooper Peterson] was speaking to [Ms.] Kick." *Id.* at 6-7, 20. Licensee's vehicle was parked next to the curb "about [one] house down from his actual residence," but the vehicle was not running. *Id.* at 7.

Trooper Peterson asked Licensee to provide his driver's license, vehicle registration, and proof of insurance. *Id.* Licensee opened the passenger door of his vehicle and sat in the front passenger seat while "attempting to get the information." *Id.* Trooper Peterson testified that while he was speaking with Licensee, Licensee's "speech was slow, his eyes were watery," and he "could smell alcohol coming from [Licensee] at that time." *Id.* Trooper Peterson testified that the smell of alcohol emanating from Licensee was so strong that he could smell it while he was standing outside Licensee's vehicle. *Id.*

When Trooper Peterson asked Licensee about the accident, "[Licensee] related that . . . he did strike Ms. Kick, rear-ended her. But he explained that it happened further [sic] up from where it actually happened. And he explained that Ms. Kick flipped him off, and he was afraid for his safety and fled home." *Id.* at 8. Trooper Peterson estimated that the distance between the accident scene and Licensee's home is "about a mile." *Id.*

Trooper Peterson asked Licensee if he had been drinking, and Licensee replied that he had attended a funeral earlier and "when he arrived home, . . . he drank a few beers and a few shots to calm his nerves." *Id.* at 9.

Trooper Peterson asked Licensee to perform field sobriety testing, but Licensee replied that "he wasn't taking any tests, and that he wasn't getting out of his car in the seated position." *Id.* at 8. When Trooper Peterson asked Licensee a second time to exit his vehicle, Licensee complied and gave the trooper his driver's license, vehicle registration, and proof of insurance. *Id.* at 9, 17. Trooper Peterson then testified:

> Based on my training and experience, typically when somebody flees the scene of a crash, it's . . . for only a couple of reasons. *One, typically intoxication* or usually [his or her] license is suspended . . . . *And being that I was able to hear* [*Licensee's*] *slow speech and his eyes were watery, and he admitted to drinking even at home, based on my experience,* [*he*] *was probably under the influence during the crash.*

*Id.* at 9 (emphasis added).

Trooper Peterson testified that after Licensee refused field sobriety testing, the following exchange took place:

> At that time [Licensee] was in a standing position in front of me, and he continued to put his hands in his vest. He was wearing like a motorcycle-style leather vest. It was very cold that day, . . . about 14 degrees. . . . He said his hands were cold. I asked him to remove his hands from his pocket just for officer safety. I was going to allow him to put his hands in his pockets based on the weather, but he relayed [that] he had a revolver in his right pocket. So at that time I placed him into custody to remove the revolver from his pocket.
>
> . . . .
>
> After I took him into custody, I placed him in handcuffs. I asked his wife to remove the revolver from his pocket and she did. She took the

4

revolver, and I believe she placed it in the house at that time. And I placed [Licensee] inside of my patrol vehicle because of the weather.

*Id.* at 10-11.[2] Trooper Peterson observed that after he placed Licensee inside the patrol vehicle, the smell of alcohol emanating from Licensee "made the entire patrol car interior smell like alcohol." *Id.* at 23.

After consulting with the District Attorney's Office by telephone, Trooper Peterson read the implied consent warnings from DOT's DL-26B Form[3] to Licensee while they were seated inside the patrol vehicle. *Id.* at 11-12; *see* R.R. at 53a. Trooper Peterson testified that Licensee refused to sign the DL-26B Form, telling the trooper that "he wasn't signing anything." N.T., 7/22/22, at 12; *see* R.R. at 53a. Licensee refused to sign the form again after he stepped out of the patrol vehicle, stating "that he was not signing that paper." N.T., 7/22/22, at 13. Licensee also refused to submit to a blood test. *Id.*

On cross-examination, Trooper Peterson testified that Licensee told him that he had fled the accident scene because he felt threatened by Ms. Kick. *Id.* at 17. Trooper Peterson also admitted that he had no evidence to dispute Licensee's claim that Ms. Kick had threatened him. *Id.* Trooper Peterson testified that he did not charge Licensee with DUI. *Id.* at 18. Trooper Peterson reiterated that Licensee's "speech was slow and his eyes were watery" and further testified that Licensee "was slow walking," but he was not staggering. *Id.* at 19.

On re-direct examination, Trooper Peterson testified that "Ms. Kick is a short, petite woman[] . . . in her late 60[]s to early 70[]s in age," who probably weighs

---

[2] Licensee had a license to carry a firearm. N.T., 7/22/22, at 18.

[3] The DL-26B Form contains the implied consent warnings required to be given when a police officer requests a chemical test of a licensee's blood.

"120-30 pounds." *Id.* at 21.[4] Trooper Peterson also reiterated the reasons why he believed Licensee had driven his vehicle while under the influence, as follows:

> *I believe that based on the totality of the circumstances that he was under the influence based on his fleeing from a scene.* As I explained earlier, typically people only flee for certain reasons and typically intoxication is one of them based on my training and experience. *There are other reasons as well, but that was . . . my reasoning for thinking that he was under the influence at that time.*
>
> . . . .
>
> *As well as the smell of his breath, his actions, his eyes, and his speech.*

*Id.* at 22-23 (emphasis added).

Finally, Trooper Peterson testified that, with regard to Licensee's assertion that he fled because he was threatened, "[b]ased on [Ms.] Kick's size and stature, and [the fact] that [Licensee] was carrying a firearm, I don't believe there would be any other reason to be threatened by a small female." *Id.* at 24-25. Trooper Peterson also testified that, had Licensee felt threatened, "he could have pulled off into multiple businesses at that time to exchange information." *Id.* at 25.

Following the hearing, on August 8, 2022, the Trial Court entered an Order dismissing Licensee's statutory appeal. In its Order, The Trial Court explained:

> In reaching this determination, the [Trial] Court relies upon the case law cited within [DOT's] brief, supportive of the following propositions: 1) that the trooper is permitted to rely upon third-party witness testimony to develop reasonable grounds that [Licensee] was the operator of the vehicle at issue; and 2) that the trooper can utilize his own observations and experience to form reasonable grounds for suspecting that [Licensee] was driving while intoxicated.

---

[4] Licensee was born on January 25, 1964, *see* R.R. at 49a, so he was 58 years old at the time of the hit-and-run accident.

Trial Ct. Order, 8/8/22, at 1.[5] Licensee now appeals to this Court.[6]

### Analysis

First, Licensee asserts that the Trial Court erred in concluding that DOT satisfied its burden of proving a violation of the Implied Consent Law. According to Licensee, DOT "presented no first-hand testimony relative to [Licensee's] condition . . . at the time of the operation of his motor vehicle" and "no evidence . . . as to whether [Licensee] had indulged in alcohol prior to, or during, his operation of the vehicle." Licensee Br. at 10.

To support the suspension of a licensee's operating privilege under the Implied Consent Law, DOT must prove that the licensee: (1) was arrested by an officer who had reasonable grounds to believe that he or she was driving, operating, or in actual physical control of the movement of a vehicle while in violation of Section 3802 of the Vehicle Code; (2) was asked to submit to a chemical test; (3) refused to do so; and (4) was warned that a refusal would result in the suspension of his or her operating privilege. *Garlick v. Dep't of Transp., Bureau of Driver Licensing*, 176 A.3d 1030, 1035 (Pa. Cmwlth. 2018) (*en banc*).

The only element at issue in this case is whether DOT met its burden of proving that Trooper Peterson had reasonable grounds to believe that Licensee operated his vehicle while under the influence of alcohol or a controlled substance. Our Supreme Court has explained that "[r]easonable grounds exist *when a person in the position of the police officer, viewing the facts and circumstances as they*

---

[5] On October 5, 2022, the Trial Court issued a one-page Pa.R.A.P. 1925(a) Opinion, in which it merely reaffirmed its August 8, 2022 Order.

[6] Our review is limited to determining whether the Trial Court committed an error of law or abused its discretion or whether the Trial Court's findings of fact are supported by substantial evidence. *Reinhart v. Dep't of Transp., Bureau of Driver Licensing*, 954 A.2d 761, 765 n.3 (Pa. Cmwlth. 2008).

7

*appeared at the time,* could have concluded that the motorist was operating the vehicle while under the influence of intoxicating liquor." *Banner v. Dep't of Transp., Bureau of Driver Licensing*, 737 A.2d 1203, 1207 (Pa. 1999) (emphasis added). Furthermore:

> [*A*]*n officer need not witness the licensee operating a vehicle to place him under arrest for driving under the influence.* Additionally, an officer's reasonable belief that the licensee was driving while under the influence will justify a request to submit to chemical testing *if "one reasonable interpretation of the circumstances" as they appeared at the time supports the officer's belief.* Further, courts appropriately defer to an investigating officer's experience and observations where reasonable grounds exist to support the officer's belief based on the totality of the circumstances.

*Yencha v. Dep't of Transp., Bureau of Driver Licensing*, 187 A.3d 1038, 1044-45 (Pa. Cmwlth. 2018) (internal citations omitted) (emphasis added).

Here, the evidence of record established that: (1) Licensee admitted to Trooper Peterson that he had rear-ended Ms. Kick's vehicle and left the scene;[7] (2) Trooper Peterson arrived at Licensee's home 24 minutes after Ms. Kick's 911 call and met Licensee shortly thereafter; (3) Trooper Peterson observed that although Licensee was not staggering, his gait was slow, his eyes were glassy, and his speech was slow; (4) Licensee admitted to Trooper Peterson that he had been drinking; (5) during their interaction, Trooper Peterson smelled a strong odor of alcohol emanating from Licensee, both while standing outside Licensee's vehicle and while Licensee was sitting inside the patrol vehicle; and (6) Licensee refused field sobriety testing.[8]

---

[7] In his appellate brief, Licensee admits that "[t]here is no dispute that he was the operator of the vehicle in question." Licensee Br. at 10 n.1.

[8] In his brief, Licensee asserts:

**(Footnote continued on next page…)**

Trooper Peterson also discredited Licensee's statement that he fled the accident scene because he felt threatened by Ms. Kick, given her appearance and the fact that Licensee was carrying a concealed weapon. N.T., 7/22/22, at 24-25. Based on his training and experience, Trooper Peterson believed that Licensee fled the scene because he was intoxicated. *Id.* at 9, 22.

Considering the totality of the circumstances known by Trooper Peterson at the time he took Licensee into custody, coupled with the trooper's training and experience with DUI arrests, we conclude that Trooper Peterson had reasonable grounds to believe that Licensee operated his vehicle while under the influence. *See Dep't of Transp., Bureau of Traffic Safety v. Doyle*, 520 A.2d 917, 919 (Pa. Cmwlth.

---

Upon smelling the odor of alcohol, the [t]rooper asked [Licensee] to perform field sobriety tests, which [Licensee] initially refused to do. *The [t]rooper then asked him again and [Licensee] complied with his request.*

Licensee Br. at 5 (emphasis added). The record, however, directly refutes this claim. Trooper Peterson clearly testified that Licensee refused all field sobriety testing, as follows:

Q[.] . . . [Did] you ask him to take a field sobriety test[] . . . ?

A[.] Yes.

Q[.] And what test did you ask him to take, do you recall?

A[.] I had asked him to do a[] [horizontal gaze nystagmus test], which is checking his eyes, as well as standardized field sobriety tests.

Q[.] Did he let you do that?

A[.] *He did not*.

Q[.] Did he let you do any field sobriety test?

A[.] *He did not*.

N.T., 7/22/22, at 10 (emphasis added); *see id.* at 8 (Trooper Peterson testified that Licensee told him that "*he wasn't taking any tests*") (emphasis added).

1987) ("We agree with [DOT] that [*the licensee's*] *involvement in an accident, combined with the strong odor of alcohol on his breath*, are circumstances under which a reasonable person could conclude that [the licensee] was operating the vehicle under the influence of alcohol.") (emphasis added).

Licensee also asserts that because Trooper Peterson arrived at his home 24 minutes after Ms. Kick's 911 call, DOT failed to prove that Licensee had been drinking *before* operating his vehicle, rather than after he arrived home. We disagree.

At the hearing, Trooper Peterson testified: "Alcohol was emanating from [Licensee's] breath as we were speaking, and I was outdoors at the time and I could smell it. When I placed him in the patrol car, it made the entire patrol car interior smell like alcohol." N.T., 7/22/22, at 23. Trooper Peterson also observed other visible signs of intoxication, including Licensee's slow gait, glassy eyes, and slowed speech. *Id.* at 7, 19, 23-24. On re-direct examination, Trooper Peterson was asked about the strong odor of alcohol emanating from Licensee during their interaction, as follows: "[I]f somebody was drinking . . . within a 15-minute period from that, based on your experience, would they have that strong of an odor?" N.T., 7/22/22, at 23. Trooper Peterson replied, "I don't believe so. *There would be no signs of intoxication in that short of* [*a*] *timeframe.*" *Id.* (emphasis added); *accord Com. v. MacPherson*, 752 A.2d 384, 387 n.3 (Pa. 2000) ("*Alcohol does not have intoxicating effects until it is absorbed into the bloodstream.* Once alcohol is imbibed, however, it is not absorbed by the body immediately. *Absorption occurs within thirty to ninety minutes after consumption.*") (emphasis added); *Hasson v. Dep't of Transp., Bureau of Driver Licensing*, 866 A.2d 1181, 1186 (Pa. Cmwlth. 2005) ("Case law in DUI criminal cases teaches that alcohol is not intoxicating until absorbed into the

10

bloodstream and that absorption takes place thirty to ninety minutes after consumption."). Given the 24-minute timeframe between Ms. Kick's 911 call and Trooper Peterson's arrival at Licensee's home, as well as the indicia of intoxication exhibited by Licensee, we conclude that Trooper Peterson had reasonable grounds to believe that Licensee had been drinking *before* operating his vehicle.

Next, Licensee asserts that DOT failed to prove an Implied Consent Law violation because Trooper Peterson never arrested him for DUI. Licensee Br. at 7. Licensee contends that Trooper Peterson placed him into custody for possessing a firearm, not for suspicion of DUI, and, thus, the trooper had no authority to request that he submit to a blood test. *Id.* at 12-13.

"The question of whether or not a driver has been 'placed under arrest' for purposes of Section 1547(b) of the [Implied Consent Law] is a factual, rather than a legal determination, and *all that is necessary is that the driver be under the custody and control of the person effecting the arrest*." *Dep't of Transp., Bureau of Driver Licensing v. McGlynn*, 611 A.2d 770, 773 (Pa. Cmwlth. 1992) (emphasis added). Contrary to Licensee's assertion, "[a] formal declaration of arrest is not required." *Id.* Rather, "the relevant inquiry is *whether the driver, at the time he was asked to submit to the chemical test, should have inferred from the totality of the circumstances that he was under the control and custody of the officer*." *Id.* (emphasis added); *see also McCrorey v. Dep't of Transp.*, 619 A.2d 797, 799 (Pa. Cmwlth. 1992) ("Even though a suspect taken into custody for an offense other than DUI or those under the Vehicle Code may not believe [he or she is] being arrested for DUI, *this does not preclude a finding that the circumstances surrounding the arrest, coupled with subsequent events occurring while the suspect is in police*

11

*custody, would put a reasonable person on notice that* [*he or she is*] *also being held in custody for DUI.*") (emphasis added).

The record shows that after handcuffing Licensee and placing him inside the patrol vehicle, Trooper Peterson read the implied consent warnings from the DL-26B Form to Licensee. N.T., 7/22/22, at 11-12. The first warning on the DL-26B Form informed Licensee: "*You are under arrest for driving under the influence of alcohol or a controlled substance* in violation of Section 3802 of the Vehicle Code." R.R. at 53a (emphasis added). The third warning on the DL-26B Form informed Licensee that his operating privilege would be suspended for at least 12 months if he refused a blood test. *See id.* After Trooper Peterson read these warnings, Licensee repeatedly refused to sign the form and refused to submit to a blood test. N.T., 7/22/22, at 13. While Trooper Peterson testified that he initially placed Licensee into custody for possessing a firearm, the totality of the circumstances, including the events that subsequently occurred inside the patrol vehicle, should have placed Licensee on notice that he was being held in custody for DUI. *See McCrorey*, 619 A.2d at 799. Therefore, we conclude that DOT established, through Trooper Peterson's credible testimony, that Licensee was in his custody and control, and thus "under arrest" for DUI, when he requested the blood test as required by the Implied Consent Law.

## Conclusion

We conclude that the Trial Court correctly determined, based on the evidence of record, that DOT satisfied its burden of proving that Trooper Peterson had reasonable grounds to believe that Licensee operated his vehicle while under the

12

influence of alcohol or a controlled substance.  Accordingly, we affirm the Trial Court's Order.

_____
ELLEN CEISLER, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Kurt Phillip Hoerath,           :
           Appellant       :
                              :
       v.                 :  No. 946 C.D. 2022
                              :
Commonwealth of Pennsylvania,  :
Department of Transportation,    :
Bureau of Driver Licensing      :

**O R D E R**

AND NOW, this 8th day of September, 2023, the August 8, 2022 Order of the Court of Common Pleas of Cambria County is hereby AFFIRMED.

                                 _____
                                 ELLEN CEISLER, Judge